IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



FILED

JUL 11 2011

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

ROMAINE FRANCIS,

    Plaintiff,

v.                                          Civil Action No. 3:09cv235

SHERIFF C.T. WOODY,
et al.,

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on the Defendants' MOTION
FOR SUMMARY JUDGMENT (Docket No. 59) and the Plaintiff's SECOND
MOTION FOR SANCTIONS (Docket No. 64). For the reasons discussed
below, the motion for summary judgment will be granted and the
motion for sanctions will be denied.

## BACKGROUND

The Plaintiff, Romaine Francis, was an inmate in the
Richmond City Jail from September 22, 2006 to December 13, 2006.
While he was incarcerated, Francis alleges that the four
Defendants -- Richmond Sheriff C.T. Woody, Dr. Stanley Furman,
Major Cheryl Robinson, and medical worker Herbert Anderson --
showed "a deliberate indifference to [his] rights, privileges
and immunities secured by . . . the Fifth, Eighth and Fourteenth

Amendments to the United States Constitution." Am. Compl. ¶ 102. Francis brings five counts. The first four counts, one for each individual defendant listed above, are brought through 42 U.S.C. § 1983, to assert violation of federal constitutional rights under color of state law. The fifth count alleges that "Sheriff Woody is strictly liable individually under the common law for the conduct of his sheriff's deputies" because "the law looks upon Sheriff Woody and his deputies as if such conduct were his own." Am. Compl. ¶¶ 175-76.

The Defendants initially moved for summary judgment on September 29, 2009. The motion was fully briefed and argued before the Court on December 9, 2009. Along with the summary judgment motion, the Court considered the Plaintiff's Motion for Sanctions, which it treated as a motion for additional discovery. Observing that the Plaintiff had withdrawn his claims in Count III against Dr. Furman, the Court granted the motion for summary judgment as to Count III. Order entered December 21, 2009 (Docket No. 53).

However, the motion for summary judgment was denied as to Counts I, II, IV, and V, pending additional discovery into several issues: (1) the "guard force" identified in the deposition of Dr. Rhoades, a former prison psychologist; (2) the adequacy of the Richmond jail's grievance process; (3) Sgt.

2

Jones's alteration of Francis's grievance; and (4) any connection between Maj. Robinson and the decision to place Francis in a "strip cell." Order entered December 21, 2009 (Docket No. 53). The Court set a schedule for this additional discovery, as well as for the filing and briefing of subsequent motions for summary judgment. The material facts that underpin the Court's decision are as follows, noting areas that Francis asserts are in material dispute.

Francis was incarcerated in the Richmond City Jail on September 22, 2006. At some point before that date, he had been diagnosed with a mass in his chest. However, Francis began to serve his jail term (imposed for a violation of Va Code Ann. § 18.2-427, use of profane, threatening, or indecent language over public airways or by other methods)[1] before he was able to receive testing to determine whether the mass was malignant. Francis Aff. ¶ 2. On October 3, 2006, about eleven days after his initial incarceration, Francis told Nurse Kirkland at the jail's medical center that he had emphysema, a mass lesion, Chronic Obstructive Pulmonary Disease (COPD), and "holes in his lungs." Kirkland consulted with Maj. Cheryl Robinson, medical services director (but not a provider), and Robinson recommended

---

[1]  The details of Francis's conviction, Case No. CR06M01677-00, were obtained from the Virginia Courts Case Information website.

3

a breathing treatment for Francis. Albuterol was administered on that same date, October 3, 2006. Francis Aff. ¶¶ 21-28; Robinson Aff. ¶¶ 3-5.

On October 6, 2006, Dr. Furman, the jail physician, examined Francis, prescribed Spiriva (a respiratory drug), and sought to send Francis to MCV for evaluation. Dr. Furman saw Francis again on October 10, 2006 when he complained of similar symptoms. Robinson Aff. ¶¶ 6-7.

On October 18, 2006, after he fell to the ground while experiencing shortness of breath, and after jail personnel checked his vital signs, Francis was sent to the MCV emergency room. Francis Aff. ¶¶ 40-41. After giving Francis oxygenated air, a physician at MCV examined him and observed that his "condition [did] not seem serious," but advised him to watch for certain symptoms and warning signs. Robinson Aff. Attachment A, at D0024. The MCV physician did not recommend a particular course of treatment for Francis, other than rest, lots of fluids, taking all prescribed medications, and refraining from smoking. Id.

Upon his return to the jail, Francis was removed from the general population and placed in A3L, a cell in a tier specially designated for inmates with special medical needs. On October 20, 2006, Francis was seen again by Dr. Furman, who recommended

4

pain medication and a follow-up examination at MCV for his lung mass. Robinson Aff. ¶¶ 8-9.

On October 22, 2006, Francis abruptly lost consciousness and fell to the ground outside his cell in the medical ward. The evidence Francis adduces is in considerable conflict after that point. In his affidavit, Francis asserts that he awoke lying prone on the ground, hearing "other inmates . . . yelling in my general direction, 'That man is down, stop kicking him.'" He then avers that he realized Defendant Anderson "was kicking [him] about the legs and torso, hard enough to leave me bruised and sore." Francis then told Anderson to stop kicking him, after which Anderson walked away. Also, in his affidavit Francis says that he was kicked at least four times by Anderson and was in "excruciating physical pain" for a period of about two days, "with bruising down [his] right side." Francis Aff. ¶¶ 56-61. In his deposition, Francis could not remember how many times he was kicked, and he initially stated that he was unconscious during the entire episode (which calls into question how he could remember anything), although he later indicated (upon questioning by his own counsel) that he gained consciousness as he was being kicked. Francis Depo. at 36-44.

Francis's grievance form, which he filed the day after the incident occurred, however, tells a different story. In the

5

grievance form, Francis reported attempting to speak to Anderson as Anderson approached, which, of course, necessarily meant that Francis was conscious at the time. In the grievance form, Francis also reported being kicked in the foot and leg, not in the side. And, he did not report having incurred any pain or bruising as a result of the incident.[2]

Defendant Anderson asserts that he has "never kicked any inmate," does not recognize Francis, and that the "only thing [he] can imagine" is prodding Francis with his foot to check whether Francis was conscious. Anderson Aff. ¶¶ 2-4.

At some point after the incident occurred, Francis was taken to the jail medical department in a wheelchair. Francis Depo. at 52:6-9. The record sheds no light whether this was because Francis had just been kicked, or because he was found unconscious on the floor. Francis did not report any pain to the medical personnel at that time.[3]

---

[2]    The grievance form records that "when Anderson arrived he asked me what was wrong, I tried to tell him, but he began to kick me on my right foot and leg, 4 times, I tried to tell him to stop but he just walked off."

[3]    Francis contends that he did not discuss his pain because Anderson had threatened to "put a charge on" Francis if subsequent medical examination did not reveal anything wrong with Francis.

In the grievance form, Francis asserted that Deputy Harris, as well as other inmates, observed the incident. Francis asserted that his grievance was made for the purpose of "requesting and asking the Sheriff Office to press charges on Mr. Anderson for assault and battery and mistreatment." The grievance form indicates that Francis was located in jail tier A3L when the grievance was filed. Grievances are collected by Sgt. Jones daily from 6:30 A.M. to 7:30 A.M. Jones Depo. at 29:2-8.

The events occurring after the filing of the grievance are in some dispute. Francis relates that he had intended for this grievance to circumvent medical personnel because he feared retribution. Then, "in the morning" (it is not clear *which* morning),[4] Maj. Robinson, the jail medical services director, went to Francis's location, called out for him, and "began berating [him] regarding [his] written grievance."[5] Francis then

---

[4]     In the Amended Complaint, Francis asserts that it was the morning of October 24, 2006. Am. Comp. ¶ 80. In his memorandum opposing summary judgment, at 2, Francis states that it was the morning of October 23, 2006. And, in his affidavit, he simply states "in the morning."

[5]     Although the Defendants do not mention any interaction between Maj. Robinson and Francis after the grievance was filed, they do mention that Robinson, as Anderson's superior, received a copy of the grievance and asked Anderson about it. Anderson, as he does now, denied its veracity. Robinson Aff. ¶ 12.

asserts that, approximately an hour after this interaction,[6] he was ordered to pack his belongings, and he was handcuffed and taken to "the tier housing violent criminals," where he spent the night in a "strip cell,"[7] in which he was left naked, and had no mattress for a period of "a couple hours," and in which an unspecified number of deputies passed by and may have seen him nude. After being left naked for a period of as many as 24 hours, Francis was provided clothing of the type that would indicate he was a violent criminal, when, in fact, he was only in jail for a misdemeanor. He remained in his new cell for three or four days before being released to the general population. Francis Aff. ¶¶ 68-83; Francis Depo. at 72-79.

Francis argues that his placement in the cell was a punishment for having filed the grievance against Anderson. Id. ¶ 98. In support of this theory, he makes much of the fact that

---

[6] Assuming that the jail logs are accurate, which Francis does not dispute, Francis was moved from his cell at approximately noon on October 23, 2006. Thus, for Francis's account of events to be true, he must have filed his grievance in the morning of October 23, and Robinson must have read his grievance and confronted him about it later that morning (around 11:00 A.M.).

However, the Amended Complaint asserts that Robinson confronted Francis on the morning of October 24, not October 23. Am. Compl. ¶ 80.

[7] Deputy Sheriff West testified that a "strip cell" has no furnishings save for a hole in the corner for urination and defecation. Pl. Exh. 6 at 25:9-25.

8

the jail grievance coordinator, Sgt. Rosalind Jones, manually changed the date-stamp on Francis's grievance form from October 23 to October 24, 2006. See Jones Depo. at 28:11-24 (explaining that she had forgotten to change her date-stamping device from the previous date). Francis's theory is that this alteration was performed to make it appear impossible that his placement in a "strip cell" was retributive in nature.[8]  Francis attaches several other grievances made by other inmates that show date alterations, which assertedly demonstrate that multiple grievances were altered as part of an effort to cover up the retribution that followed from his grievance.[9]

As for the ultimate resolution of his grievance, Francis avers that he "never received any notice of the disposition," did not know what to do in the event his grievance was denied (though this is belied by his express averment that he followed the procedures in the inmate handbook, which explicitly tells an inmate how to appeal), and was not advised to contact Internal Affairs. Francis Aff. ¶ 74. This last assertion is in conflict with the grievance form, which indicates that the grievance was returned to Francis on October 25, 2006 because it represented a

[8]  Francis also alleges that this alteration constitutes spoliation of evidence, for which he seeks discovery sanctions.

[9]  That evidence is equally supportive of the proposition that Jones forgot to change the date stamp.

"request" rather than a "grievance." The form did suggest that Francis write Internal Affairs about his "request." Sgt. Jones, who handled this grievance, testified that she had no remembrance of Francis's grievance other than what she gleaned from reviewing the form. Jones Depo. at 22:3-12.

Francis also asserts, relying on testimony from one former jail psychiatrist, that, at some non-specific earlier date, a "guard force," or "the administration," or "shift," as it was variously described by different deponents (one former jail psychiatrist described it as a "paramilitary organization") would sometimes put people in cells on the medical tier for non-medical reasons, in what appeared to be a disciplinary measure. Rhoades Depo. at 20-21. Although Francis does not explicitly state that this "guard force" relocated him on October 23, he seeks an inference that this occurred, and that "guard force" activities resulted in the improper intermingling of inmates having medical problems with inmates having disciplinary problems.

A deposition of Deputy Mark West, Pl. Exh. 6, which was conducted in 2010 pursuant to the order extending discovery for limited purposes, provided some pertinent testimony. West indicated that "strip cells" are used for housing inmates who "are assaultive, and spitting, throwing feces, urine and they

are held in there by medical until such time that medical determines that they have stopped misbehaving." West Depo. at 24:19-24. West later indicated that inmates in strip cells are issued paper boxer shorts, id. at 28:2-11, and that only the "medical" department or "upper administration" personnel can make the decision to place someone in a strip cell, id. at 30:7-11, and that these persons included Maj. Robinson or someone above her in the hierarchy (including, of course, Sheriff Woody), id. at 41:21-42:9. West later described the strip cell as "a time-out." Id. at 37:15. Finally, he described the "guard force" as "shift work," which means that the personnel on shift "work the buildings." Id. at 53:3-20.

The Defendants assert that, on October 23, 2006, Francis was transported from tier A3 Left to tier A2 Left because of space concerns, but that both tiers were medical tiers. The undisputed testimony is that Captain Cushionberry made the decision to move Francis, with no input from Maj. Robinson. The record of this move kept by the jail provides little information, but it confirms that space concerns were involved. However, the two names of persons who requested and authorized the move are indecipherable. Cushionberry, in ¶ 2 of his affidavit, confirms that his signature adorns the line entitled "Individual Requesting Move," and asserts that Maj. Robinson had

11

nothing to do with Francis being moved. However, the record does not clarify whose signature appears on the line entitled "Reviewed by Classification Supervisor or Designee." Def. Exh. 4, Attachment A, at D0125.

Furthermore, the Defendants assert that Francis was not moved to a "strip cell;" his relocation form indicates that he was placed in cell #1 on the tier A2 Left. Def. Exh. 4 at D0125. Robinson avers that this was not a strip cell and that the only strip cells on the A2 tier were cells #10, 11, and 12. Def. Exh. 13 ¶ 3. Moreover, the jail records show that Francis was physically moved to his new cell by Dr. Rhoades, jail psychologist at the time, at approximately 12:00 noon on October 23, 2006. Def. Exh. 4, Attachment B, at 6. Additionally, the jail records show that Francis was taken to court at 7:08 A.M. on October 24 (Def. Exh. 4, Attachment B, at 10, 13), and that he did not complain of any mistreatment then.[10] Nor is there any record of him complaining to other jail personnel about maltreatment or assault. The Defendants assert that this lack of complaining significantly impairs Francis's credibility.[11]

---

[10] The jail records also show that Francis was returned from court to the jail at approximately 5:40 P.M. Def. Exh. 4, Attachment B, at 13.

[11] As to his being classified as a violent offender, the Defendants assert that, if Francis was ever so classified, it

12

On October 26, 2010, Maj. Robinson cleared Francis for release from his cell in A2L back into the general jail population. He was seen again by jail medical staff over a month later, on November 29, 2006, when he complained of a sharp chest pain, shortness of breath, and passing out. The nurse scheduled a visit with Dr. Furman, and Francis saw Dr. Furman on December 1, 2006. Dr. Furman arranged for Francis to receive a CT scan at Retreat Hospital on December 5, 2006. Francis had the CT scan there, and the radiologist advised further evaluation with PET/CT scan. Francis was sent to MCV on December 14, but MCV would not treat Francis because his full medical records were not provided. Francis was released from the jail on December 15, 2006.

Because Francis asserts an expansive claim against Sheriff Woody -- alleging that he failed to provide adequate training to subordinates, that he operated a jail that customarily failed to provide adequate medical care, that he oversaw an arbitrary inmate safety classification system, and that he ran a flawed grievance system that worked retribution on inmates who dared to use it -- some general discussion of the facts surrounding these issues is necessary.

---

was based on his criminal history, including a prior felony conviction and an arrest in 1999 for assault and battery, which Francis does not dispute.

Sheriff Woody has adopted a number of standard operating procedures (SOPs) that are pertinent to the assertions made by Francis, including grievances, medical operations, use of force, and inmate classification. Def. Exh. 5. Those SOPs range from three to twenty-seven pages in length and provide guidance to the deputies in each of these areas. Woody testified that he checks to ensure that his subordinates are following these protocols through "unexpected appearances" and through reviewing reports and decisions. Woody Depo. at 32:12-19.

Inmates are provided instructions for using the grievance procedure to complain of legal violations, abuse, safety concerns and "inappropriate action of staff against inmates." Def. Exh. 5, Attachment E. This manual assures that the inmate will receive a written response to a grievance within nine working days of filing, and that "[t]he filing of a grievance will not be the basis for reprisals or disciplinary action directed against you." It also warns that "[a]ny law, policy, rule or regulation required to be imposed upon inmates cannot be grieved." Id. Sheriff Woody asserts that he considers inmate grievances within the proper purview of internal investigations, which runs under its own SOP. Id. Attachment G. However, the SOP itself does not speak of inmate grievances, but rather of "citizen" complaints, although the SOP could certainly be

14

construed as including inmates within its purview. Woody testified that he "occasionally" went from tier to tier to inform inmates that they could contact Internal Affairs directly, although he could not confirm that he did this while Francis was in the jail. Woody Depo. at 17:1-11. Yet, he acknowledged that he did not know whether the inmate's handbook informed an inmate that writing to Internal Affairs was an option. Id. at 18:11-23. Indeed, the handbook does not appear to do so. Def. Exh. 5, Attachment E.

Woody's deposition demonstrated that he was unfamiliar with the details of Francis's grievance during the timeframe in which it was handled, Woody Depo. at 8:17-19, and that Internal Affairs was not involved in the investigation, id. at 8:25-9:3. It also demonstrated unfamiliarity with the specifics of the grievance procedure, such as what an inmate should do when an assault grievance form is returned to him. Woody further agreed that Francis's allegations were such that Sgt. Jones should have initiated an Internal Affairs investigation even if Francis did not specifically request to "press charges." Id. at 20:6-11. He later testified that Sgt. Jones was "supposed to follow up" on any claims about medical treatment, including a referral to Internal Affairs, but he did not know whether this had occurred. Id. at 30:21-31:7.

15

In an effort to show the futility of the grievance process, Francis submits, in addition to his own grievance (which was rejected as non-grievable because it constituted a "request" rather than a grievance), numerous other grievances that were rejected for being non-grievable, such as #38453, a stab-wound victim upset about being placed in isolation (response: "housing and discipline are not grievable"); #39569, an inmate who asserted he was summarily placed in isolation as punishment for getting in an argument when, in fact, the argument was between two inmates and did not involve him (response: "housing is not grievable"); #37647, who complained of lack of exercise while spending three months on "24/7 lockdown" (response: "Housing is not a grievable issue. I suggest you write Classification."); and # 38614, who alleged that he was moved in "retaliation for utilization of the grievance procedure"[12] (response: "You were not relocated as punishment. Per your Classification History you are on Medical Observation. A2L is also a medical tier. Non-grievable.").

For a person to be hired as a deputy sheriff, he or she must have completed criminal justice training and certification by the Commonwealth. On the job, deputies receive training in

_____

[12] Ironically, this inmate complained that he was moved *out of* cell A2L No. 1 -- the very cell that Francis complained of being moved *into* because, Francis claimed, it was a "strip cell."

16

executing the SOPs, in CPR and first aid, and in various other areas to keep their training current with developments in the law and methods of its enforcement.    Woody Aff. ¶ 6.    Woody testified that a national sheriff's association provided training, at some point following January 2006, on classification and medical treatment to get the department "brought up to standard."    Woody Depo. 22:24-23:16.    Such efforts were necessary Woody claimed because, when Woody took charge of the jail in 2006, it "was in a complete mess, disarranged, run-down situation . . . .    People were ill-trained, no training at all . . . ."  Id. at 23:5-8.

As to the grievance coordinator, Sgt. Jones, Woody was unfamiliar with her formal training, but knows that "she was there when I got there" in 2006.  Woody Depo. at 11:3-6.  Woody did state that she (as with all other deputies) had received additional training during his tenure, though he did not "know exactly what training she has been going to."  Id. at 11:21-12:5.  Although he did not personally evaluate her performance, he did promote Sgt. Jones based on recommendations from her supervisor.  Id. 20:19-21:6.

Sgt. Jones has a high school education as well as all training that any other deputy sheriff would have.  She received on-the-job training by another deputy in 2002 and has served as

17

grievance coordinator ever since, including the entirety of the period in which Francis was incarcerated. She has not received any further grievance-related training since her initial on-the-job training. She testified that, if a medical grievance is considered "grievable," it goes to the medical department for handling. Jones Depo. at 15:5-9. As to the criteria for determining whether an offense is grievable, Jones asserted that an offense is grievable "if the inmate feels that his rights have been violated," id. at 15:17-18. She identified the section of the inmate handbook describing to inmates whether an offense is grievable, id. at 15:22-16:20, though she later said that some "specifics are not in the book," id. at 16:25. She was trained about an inmate's constitutional rights at her "original academy" and has supplemented that training with on-the-job experience. Id. at 20:9-21.

When pressed specifically about whether Francis's grievance request should have been classified as "grievable" and addressed as such, Jones's answers were somewhat inconsistent. According to Jones, although assault by jail personnel is grievable, id. at 34:17-21, Francis should have taken it up with the medical department or a floor deputy first, because Francis would know from reading a sign posted in the dining hall so instructing him, id. at 35:2-15. Jones also testified that Francis's

18

failure to use the phrase "I want to press charges" meant that she did not refer his request directly to Internal Affairs, because she "was unsure what he wanted," id. at 49:12-20, even though Francis's grievance form had almost identical language ("I am requesting and asking the Sheriff Office to press charges on Mr. Anderson for assault and battery and mistreatment.").

The record shows, without dispute, that Sheriff Woody does not make decisions about specifics at an inmate level, delegating that to the doctors and medical professionals who work in the jail. His deposition indicates that he was unaware of specific medical protocols such as "treatment of respiratory distress of an inmate." Woody Depo. at 5:18-20. He asserts that he was not made aware of the incident regarding Anderson's alleged kicking of Francis until the filing of this lawsuit. Id. at 35:5-36:23.

As a whole, the record reflects that Woody, as supervisor of 450 deputy sheriffs, relies on his subordinates and is not in a position to micromanage affairs. If no supervisor brings a low-level, on-the-ground problem to his attention, he is not made aware of it. Delegation of authority and reliance on subordinate officers is necessary, and he generally hears little about problems these officials face unless something goes wrong; "if it's not broke, you don't fix it." Woody Depo. at 33:17-21.

Woody is aware of a large volume of complaints concerning a range of topics -- including medical treatment, grievances, and classification -- but is not in position to remember detailed information as to every complaint about every aspect of jail operations.

The foregoing facts provide the basis upon which to assess the viability of the remaining counts alleged by Francis against Woody, Robinson, and Anderson. Counts I, II, and IV each purport to allege violations of Francis's "Fifth, Eighth, and/or Fourteenth Amendment" rights.[13] Count I alleges that Woody failed to train his subordinates and that he maintained policies or customs related to medical treatment, classification, and grievances that demonstrated deliberate indifference to Francis's constitutional rights under the "Fifth, Eighth, and/or Fourteenth Amendments." Count II alleges that Anderson's actions demonstrated "a deliberate indifference to the serious medical needs of Francis," deprived Francis of "basic human needs, i.e. Francis' need for personal security, safety, and welfare," and "punished Francis in contravention of his rights,

---

[13] As noted above, Count III, which alleged constitutional violations against the prison doctor, Dr. Furman, was dismissed by Order entered December 21, 2009 (Docket No. 53). The Fifth Amendment claim in Count II, against Anderson, was dismissed by Order entered on July 31, 2009 (Docket No. 30).

privileges and immunities secured by the Constitution," all in violation of the "Fifth, Eighth and/or Fourteenth Amendments." Count IV alleges that Robinson violated Francis's constitutional rights under the "Fifth, Eighth, and/or Fourteenth Amendments" through her deliberate indifference to his medical needs and by taking retaliatory action against him for using the grievance procedure. Count V, a state law claim, asserts that Woody, as sheriff, is vicariously liable for the wrongful acts of his deputies, including Maj. Robinson and several other deputies not named as defendants.[14]

## DISCUSSION

### A. Motion for Sanctions

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Silvestri v. GMC, 271 F.3d 583, 590 (4th Cir. 2001). It is not recognized as an independent tort in the Fourth Circuit, but is rather a "rule of evidence," Hodge v. Wal-Mart Stores, Inc., 360 F.3d 446, 450 (4th Cir. 2004), that may lead a court to sanction the spoliator for a discovery violation pursuant to its inherent power analogous to the

---

[14] Count V does not seek to hold Woody liable for the acts of Anderson, a jail medical worker.

21

explicit power granted in Fed. R. Civ. P. 37(b)(2) to sanction the violation of discovery orders. Silvestri, 271 F.3d at 590. As such, "federal law of spoliation applies." Id.

Although "a court must find some degree of fault to impose sanctions," id., and thus spoliation cannot be predicated upon a strict liability theory, conduct that is merely negligent may serve as the basis for a finding of spoliation. Id. at 593. If a party destroys evidence, deliberately or negligently, that is relevant to a lawsuit that has been filed, or that the destroying party reasonably should anticipate will be filed, then spoliation has occurred; no separate showing of prejudice is required for a finding of spoliation. Id. at 590. In the Fourth Circuit, any level of fault, or culpable conduct, suffices for a finding of spoliation." E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc., 2011 WL 1597528, at *10 (E.D. Va. 2011).

In his motion for sanctions, Francis alleges that Sgt. Jones's manual alteration of the date-stamp on his grievance, as well as that of nine other grievances that Francis submits, constitutes spoliation of evidence. Francis specifically asserts a belief that Jones altered these grievances after the fact to make it appear as if the grievance was received on October 24, when Francis asserts that it was actually received

on October 23. As noted above, Francis argues that this was done to make it appear impossible that Francis's relocation (on October 23) was a retaliatory punishment for his filing of a grievance. Francis also asserts that spoliation occurred when Robinson, in August 2009, added the words "response attached" to the line labeled "resolution" on Francis's grievance form.

However, *no evidence was lost or destroyed*. There were two acts of alteration. The alteration by Jones of the date on Francis's grievance, as well as the other grievances submitted, is accompanied by Sgt. Jones's undisputed testimony that she manually changed the date stamp on the grievance form from October 23 to October 24, 2006. And, the fact of the alteration is readily visible. The alteration was done in the regular course of business and is not the sort of alteration to which a finding of spoliation can be made on this record. The added words "response attached" present a similarly transparent alteration in the ordinary course of business and likewise not an act of spoliation. Francis is free to argue the proper inferences to be made from these alterations, but he has not shown the basis for a finding of spoliation. Moreover, even if the alterations were to be classified as spoliation, there could be no sanctions because Francis has shown no prejudice. And, indeed, there is none to be shown.

23

**B. Summary Judgment**

**1. Applicable Legal Standard**

Summary judgment is appropriate when there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). A material fact in dispute appears when its existence or non-existence could lead a jury to different outcomes. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party. Id.

Summary judgment is appropriate when, after discovery, a party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When a motion for summary judgment is made, the evidence presented must always be taken in the light most favorable to the non-moving party, Smith v. Virginia Commonwealth University, 84 F.3d 672, 675 (4th Cir. 1996), and all reasonable inferences that would benefit the non-moving party are to be drawn on its behalf,

24

<u>Gordon v. Kidd</u>, 971 F.2d 1087, 1094 (4th Cir. 1992). A non-moving party cannot, however, "create a genuine issue of material fact through mere speculation or the building of one inference upon another." <u>Beale v. Hardy</u>, 769 F.2d 213, 214 (4th Cir. 1985). Accordingly, the party who bears the burden of proof at trial cannot survive summary judgment without sufficient evidence to sustain that burden of proof. <u>Celotex</u>, 477 U.S. at 327.

At the summary judgment stage, the court "may not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Products</u>, 530 U.S. 133, 150 (2000). The court should only refuse to consider relevant, material evidence if such evidence is "inherently incredible." <u>McLean v. Patten Communities, Inc.</u>, 332 F.3d 714, 716 (4th Cir. 2003).

In sum, "the inquiry . . . is . . . whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Liberty Lobby</u>, 477 U.S. at 251-52. If the non-moving party's evidence is "merely colorable" or "not significantly probative," summary judgment is proper. <u>Id.</u> at 249.

Additionally, for a court to attach any probative value to an affidavit that conflicts with testimony adduced in earlier

depositions, the affidavit must provide a reasonable explanation of the contradictions between the former testimony and the latter affidavit. Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999). See also Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct."); accord Erwin v. United States, 591 F.3d 313, 325 n.7 (4th Cir. 2010).

An affidavit is admissible, even if unsworn, as evidence in a summary judgment motion if "signed under penalty of perjury." Davis v. Frapolly, 756 F. Supp. 1065, 1067 (N.D. Ill. 1991). "Under 28 U.S.C. § 1746, an unsworn declaration which is dated and signed by the declarant under the penalty of perjury, has the same force and effect as a sworn affidavit for the purposes of any requirement imposed by any federal rule or regulation." Id. This is the law in the Fourth Circuit. See Willard v. IRS, 776 F.2d 100, 102 n.3 (4th Cir. 1985) (finding that "unsworn declarations . . . made under penalty of perjury, are permitted in lieu of affidavits"). Thus, Francis's argument, Pl. Oppo. at 12-13, that the Defendants' affidavits should be stricken for failure to comply with the Federal Rules is without merit.

In this action, the inherent credibility of the statements in Francis's affidavits is a central issue. The vast majority of the evidence on which Francis relies to oppose summary judgment consists of self-serving language in his affidavit, much of which contradicts other portions of his testimony or other facts in the record that Francis does not dispute. Without his affidavit, Francis would not have a factual basis for stating a claim, let alone surviving summary judgment. However, the Court must credit his testimony to the extent that it has any inherent credibility. This principle is particularly important given the setting in which these alleged constitutional violations occurred for, if an inmate could never support his claims with his own words, prison abuses would never be remediable through the Courts. However, if such self-serving testimony were universally accepted with no regard for its relationship to the remainder of the record, it would allow any prisoner with a vivid imagination, a poorly developed sense of integrity, and a grudge to subject state actors to expensive, drawn-out litigation that would invariably proceed all the way to trial.

## 2. Claims Under Section 1983

As Francis observes, "[t]he failure of any single condition of confinement to violate a prisoner's constitutional rights is not fatal to a claim under 42 U.S.C. § 1983; the cumulative effect of all conditions may render the confinement unconstitutional." Williams v. Griffin, 952 F.2d 820, 824-25 (4th Cir. 1991). Thus, although Francis alleges a number of deleterious conditions that would not amount to a constitutional violation separately and individually, he urges the Court to consider the holistic experience of his confinement, which allegedly included a number of violations of varying varieties. However, Francis does not specifically allege a broad "conditions of confinement" claim as articulated in Williams, which recognized that such a claim is only viable when the conditions "have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise -- for example, a low cell temperature at night combined with a failure to issue blankets." Id. at 824 (quoting Wilson v. Seiter, 501 U.S. 294, 304 (1991)). In Williams, the Fourth Circuit found a cognizable "conditions of confinement" claim when serious prison overcrowding was combined with highly unsanitary conditions. Id. at 825.

Francis's legal claims, by contrast, essentially boil down to two types: Fourteenth Amendment Procedural Due Process claims and Eighth Amendment claims of excessive force and degrading punishment. The record does not show a scenario in which multiple conditions of confinement worked to deprive him of a single, articulable human need. The law specifically disavows the notion that "all prison conditions are a seamless web for Eighth Amendment purposes," id. at 824, let alone for purposes of allegations covering broader constitutional territory. "Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." Id.

With these principles in mind, the Court turns to Francis's specific constitutional claims. Because the allegations against Woody in Count I derive largely from the allegations against Anderson and Robinson in Counts II and IV, the latter two counts are addressed first.

### a. Count II Against Medical Worker Anderson

Francis raises an Eighth Amendment excessive force claim against Anderson for kicking Francis while he lay on the ground.[15] The Eighth Amendment does, in fact, "forbid 'the

---

[15] Francis originally claimed violations of the "Fifth, Eighth, and/or Fourteenth Amendments" in Count II but, as noted

29

unnecessary and wanton infliction of pain.'" Norman v. Taylor, 25 F.3d 1259, 1262 (4th Cir. 1994) (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)). "Significant injury" is not required for a prisoner to state an excessive force claim; "[t]he 'core judicial inquiry' . . . [is] not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Wilkins v. Gaddy, 130 S. Ct. 1175, 1178 (2010).

According to Francis's affidavit, Anderson kicked him in the legs and torso while he was unconscious; Francis awoke while being kicked, and the kicking continued until Francis told Anderson to stop, and Francis suffered "excruciating pain" with extensive bruising on his side for several days. According to Francis's grievance form, however, which contains statements

previously, the Fifth Amendment claim in Count II was dismissed by Order issued on July 31, 2009. "[T]he Fourteenth Amendment's Due Process Clause imposes substantive limits on the States' discretion, making the Eighth Amendment's prohibition against . . . cruel and unusual punishments applicable to the States." Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 433-34 (2001). Thus, claims brought by convicted prisoners related to excessive force and medical care are properly analyzed under the Eighth Amendment. See Whitley v. Albers, 475 U.S. 312, 327 (1986) ("[T]he Eighth Amendment . . . serves as the primary source of substantive protection to convicted prisoners" and "the Due Process Clause affords [a convicted prisoner] no greater protection than does the Cruel and Unusual Punishments Clause."). Count II does not allege a claim of procedural due process.

written by Francis the day after the incident occurred, he was conscious and attempting to speak to Anderson when Anderson began kicking him in the foot and leg. Further, the grievance form did not refer to any pain or bruising, nor to any kicks to the torso on which he later reported, in his affidavit, experiencing bruising. Francis asserts in his affidavit that he did not report his pain because he was afraid of retaliation, but he also states that he thought his grievance would circumvent the medical department. There is no medical evidence as to the extent of Francis's injuries, other than that Francis was given Prednisone and Neurotonin for three days after the alleged kicking incident, and the Defendants submit uncontradicted evidence that these medications were related to Francis's COPD. There is no admissible evidence from other witnesses as to the extent of the kicking; although Francis asserts on his grievance form that Maj. Harris and other inmates witnessed the kicking, he produces no evidence from Harris or anyone else.[16]

---

[16]    Francis's affidavit does state that "[w]hen I awoke I heard other inmates in or near the medical ward yelling in my general direction, 'That man is down, stop kicking him.'"    Pl. Exh. 6 ¶ 57.    However, that appears to be inadmissible hearsay, although it may qualify under the "present sense impression" exception. The briefing does not address this hearsay issue.

31

This record presents exactly the sort of scenario in which the only factual issue is which version of Francis's facts to believe. Cf. Barwick, 736 F.2d at 960. No reasonable juror could square the facts as stated in Francis's affidavit -- which indicates excruciating pain and bruising *down his right side* as he was kicked while unconscious -- with his grievance form that does not indicate he was ever kicked in the side and describes him as being conscious at the time of the kicking. Further, Francis's claim that he did not discuss this for fear of retribution and the very request he made to have Anderson charged with assault does nothing to explain the fundamental inconsistencies in his testimony -- if his fear of retribution was so great, then he certainly would not have grieved, and if he actually wanted Anderson to be punished for his actions, he certainly would have noted that Anderson's actions caused him physical injury. And, he has no evidence to corroborate any version of his story. Thus, Francis has failed to create a genuine issue of material fact as to whether he was kicked by Anderson at all.[17]

---

[17]    The parties spill considerable ink in the briefs about qualified immunity and the Supreme Court's recent rejection in Wilkins v. Gaddy, 130 S. Ct. 1175, of the Fourth Circuit standard in effect at the time of Francis's injury, e.g. Taylor, 25 F.3d 1259, which all but precluded recovery for de minimis injuries. However, the issue before the Court does not concern

32

### b. Count IV Against Major Robinson

Francis appears to have dropped the allegations in his complaint that Robinson was deliberately indifferent to his serious medical need because he does not maintain these arguments in his summary judgment pleadings. Instead, Francis focuses on Robinson's alleged role in having Francis taken to an isolated cell and left naked for approximately 24 hours. Francis argues, in his summary judgment pleadings, that Robinson violated his special right to privacy in his genitalia as secured by the Fourth Amendment, but there is no Fourth Amendment claim in the Amended Complaint.[18]  Francis alleges a violation of his right to be free from cruel and unusual punishment as secured by the Eighth Amendment and deprivation of

---

the severity of the injury or the maliciousness of the conduct, but the credibility of Francis's testimony.  Francis contends in his affidavit that he was kicked savagely and had bruises lasting for days, an injury for which Anderson could not have qualified immunity.   However, the inherent incredibility of Francis's affidavit in light of the rest of the record precludes the Court from giving any weight to the portions of Francis's affidavit that describe the kicking incident, and it is the failure to create a factual issue that dooms Count II.

[18]     The Fourth Amendment claim in the original complaint was dismissed by the Court.  See Memorandum Opinion and Order issued May 22, 2009 (Docket Nos. 17 and 18).  There is no Fourth Amendment claim in the Amended Complaint.   Therefore, his reference to a Fourth Amendment claim will not be addressed.

33

a liberty interest without due process in violation of the Fourteenth Amendment.[19]

As to Francis's Eighth Amendment claim, the Fourth Circuit has found that two 48-hour periods of nude confinement, in a cell with nothing but a drain hole, "constitute[d] a per se violation of the Eighth Amendment." McCray v. Burrell, 516 F.2d 357, 369 (4th Cir. 1974) (en banc).

As to Francis's Fourteenth Amendment procedural due process claim, as the Court noted in its Memorandum Opinion denying Defendants' motion to dismiss, "a cognizable interest may be created . . . through the codification of certain policies and procedures." Francis v. Woody, 2009 U.S. Dist. LEXIS 43599, at *29. (May 22, 2009). When the state promulgates a written policy in "language of an unmistakably mandatory character," creating expectations that it will be followed, a liberty interest may arise. Id. (quoting Hewitt v. Helms, 459 U.S. 460, 471-72 (1983)). However, "lawful incarceration brings about the

---

[19]   Count IV also claimed a violation of the Fifth Amendment which the Court considered as a possible due process liberty interest.   See Memorandum Opinion, May 22, 2009, pp. 24-27. However, since none of the defendants are agents of the federal government, the Fifth Amendment does not apply.   See Chavez v. Martinez, 538 U.S. 760, 788 (2003).   ("By its terms, the Fifth Amendment itself has no application to the States.   It is, however, one source of the protections against state actions that deprive individuals of rights 'implicit in the concept of ordered liberty' that the Fourteenth Amendment guarantees.").

necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Sandin v. Conner, 515 U.S. 472, 485 (1995). And, indeed, the Supreme Court has found that a thirty-day period of disciplinary confinement, even if it is discretionary and not made pursuant to an official policy covering administrative segregation, did not infringe upon any cognizable liberty interest when the conditions of that segregation did not differ significantly from the conditions of ordinary confinement. Id. at 485-86.

In Sandlin, the Court concluded that its decision in Hewitt v. Helms "had created a largely unworkable scheme for assessing whether particular state regulations conferred liberty interests on inmates." Puranda v. Johnson, 2009 WL 3175629, *3 (E.D. Va. Sep. 30, 2009)(citing Sandlin, 515 U.S. at 480). "Keeping in mind a desire to address issues of real substance, the Court concluded that state-created liberty interests for inmates 'will be generally limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" Id. at *4 (citing Sandlin, 515 U.S. at 484). The Court also stated "that a deprivation may be substantial enough to implicate the

Fourteenth Amendment if the deprivation 'will inevitably affect the duration of [a prisoner's] sentence.'" Id.

Francis asserts that his nude confinement of up to 24 hours[20] in a cell, 2 hours of which were spent without a mattress, violated his Eighth Amendment rights under McCray and his Fourteenth Amendment rights because it was an express violation of the policy articulated in the inmate's handbook that the filing of a grievance would not lead to retaliatory action.

The fatal flaw in all of Francis's claims against Robinson is his failure to show causation. There is nothing in the record that would allow a reasonable juror to conclude that Robinson ordered Francis to be removed from his cell and stripped, let alone that she did so in response to Francis's grievance. The conflicting dates that Francis gives for his relocation within his pleadings, his affidavit, his deposition testimony, and other portions of the record that he does not dispute, show such a fundamental incoherence that no reasonable jury could adopt the inference which he urges -- that the date on Francis's grievance form was altered to make it appear as if

---

[20] As noted previously, supra page 12, jail records show that Francis was moved to his new cell at approximately 12:00 noon on October 23, 2006 and that he was taken to court at 7:08 a.m. on October 24, so the confinement lasted no longer than nineteen hours.

it was received on October 24, 2006, when in fact it was received on October 23, as a cover-up for Robinson's retaliatory actions. Moreover, to find causation by Robinson would require a second inference -- that Major Robinson acted, through the "guard force" or possibly through some other means, to have Francis stripped and isolated. Other than Francis's testimony that Robinson berated him in his cell and that he was moved an hour later, nothing in the record supports this theory. Thus, Francis urges precisely the sort of inference-stacking that the Fourth Circuit recognizes as insufficient to oppose a properly made and supported motion for summary judgment, Beale, 769 F.2d at 214, and thus neither of Francis's constitutional claims in Count IV can survive.

Had Francis adduced adequate proof of causation, he might have a legal basis for his Eighth Amendment claim under McCray, as such confinement was allegedly punitive in nature, and for his Fourteenth Amendment claim, because the inmate handbook clearly states that grievances shall not form a basis for retaliatory action against an inmate by the prison. But, without adequate proof of causation, these claims fail.

### c. Count I Against Sheriff Woody

The nub of Francis's constitutional claim against Woody is that his unofficial policy of allowing deputy sheriffs to

arbitrarily strip inmates naked and place them in isolated cells violates Francis's Eighth Amendment rights, in that it constitutes cruel and unusual punishment, and his Fourteenth Amendment rights, in that it constitutes a deprivation of a liberty interest without due process. Francis also alleges that Woody failed to properly train his subordinates, which caused these subordinates to violate Francis's Eighth and Fourteenth Amendment rights.[21]

Francis's "unofficial policy" claim requires a showing that: (1) Woody maintained a policy of arbitrarily segregating and stripping inmates; (2) this policy demonstrated deliberate indifference to Francis's constitutional rights; and (3) the policy caused or contributed to the constitutional violation in question. Brown v. Mitchell, 327 F. Supp. 2d 615, 643 (E.D. Va. 2004) (citing Spell v. McDaniel, 824 F.2d 1380, 1385 (4th Cir. 1987); Williams v. Griffin, 952 F.2d 820, 826 (4th Cir. 1991)). The analysis looks beyond the mere text of Woody's documented policies into the actual conditions of the jail and the manner in which it was operated. As Francis notes, "[C]onstitutional analysis of a procedure does not stop with analysis of the written policy," and "[c]onstitutional words cannot erase

_____
[21] As noted previously, although the Amended Complaint refers to the Fifth Amendment in Count I, the Fifth Amendment does not apply.

38

unconstitutional conduct." Marriott v. County of Montgomery, 426 F. Supp. 2d 1, 9 (N.D.N.Y. 2006).

However, a reviewing court "owe[s] 'substantial deference to the professional judgment of prison administrators.'" Beard v. Banks, 548 U.S. 521, 528 (2006) (quoting Overton v. Bazzetta, 539 U.S. 126, 132 (2003)). "[R]estrictive prison regulations are permissible if they are 'reasonably related to legitimate penological interests,' and are not an 'exaggerated response' to such objectives." Id. (quoting Turner v. Safley, 482 U.S. 78, 87 (1987)).

Francis's failure to train claim requires him to make a similar three-pronged showing that: (1) there was an actual violation of Francis's constitutional rights; (2) Woody failed to train his subordinates such that the failure to train demonstrated "deliberate indifference" to the needs of prisoners; and (3) training failures "actually caused" the constitutional violations. Brown v. Mitchell, 327 F. Supp. 2d 615, 651 (E.D. Va. 2004) (quoting Canton v. Harris, 489 U.S. 378, 388-90 (1989)).

On this record, neither constitutional claim against Woody has merit. Even assuming, arguendo, that Francis's account of being left naked for a 24-hour period constitutes unusual cruelty actionable under the Eighth Amendment, Francis, despite

39

considerable discovery through depositions and review of other inmate grievances, has failed to produce a single instance of another inmate being stripped naked and left that way.[22] He does produce evidence that other inmates had been placed in administrative segregation, but adduces no evidence to show that such placement was not reasonably related to legitimate penological interests. Francis also does not dispute that Woody has promulgated SOPs in the areas of classification, medical treatment, and grievances, and does not assert that these SOPs are defective.

The most Francis adduces in terms of an "unofficial policy" is that medical personnel with supervisor approval, or upper-level administration officials, may move inmates around within the prison for medical, disciplinary, or security-related reasons. This policy, in and of itself, does not show indifference to prisoners' well-being, and there is no probative evidence, on this record, to indicate that such a "policy" caused Francis to be stripped naked. And, in terms of the grievance policy, although Francis creates an issue of fact as

---

[22] Although Deputy West's deposition confirmed the existence and use of "strip cells," this term refers to the fact that the cells themselves were stripped of furniture or objects with which the inmates could cause harm to themselves or prison personnel. The inmates placed in such "strip cells" are issued paper shorts.

40

to whether it serves its intended purpose or is simply a black hole down which inmate complaints disappear without ever being meaningfully addressed, the record does not show that it led to any violations of Francis's constitutional rights.

Similarly, Francis's "failure to train" claim cannot stand. The record demonstrates only that Woody, a sheriff who supervises 450 deputies, lacks intimate familiarity with the particular training courses that several of his deputies have taken. Again, even assuming an actual violation of Francis's constitutional rights, the record does not show that any of Woody's subordinates had such inadequate training as to show deliberate indifference to the needs of prisoners. Moreover, the sort of violation that Francis alleges -- stripping a prisoner naked for daring to use the grievance system -- is not of the type that training would remedy; the impropriety of such action would be obvious to any jail employee.

### d. Qualified Immunity

The summary judgment briefs contain considerable discussion of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 129 S. Ct. 808, 815

41

(2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). Thus, it precludes liability of a state actor when he has in fact committed a constitutional violation, but such violation was not reasonably known to the state actor at the time of the violation. In this two-pronged inquiry – (1) whether a constitutional violation occurred; and (2) whether it was clearly established at the time - courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." <u>Pearson</u>, 129 S. Ct. at 818.

However, Francis has not adduced sufficient evidence to raise a genuine issue of material fact as to whether any constitutional violations occurred. Hence, a qualified immunity analysis is unnecessary, because no violation exists for which the Defendants would need to seek immunity.

**D. Count V - Common Law Sheriff Liability of Sheriff Woody**

Francis asserts that, in Virginia, at common law, sheriffs are strictly liable for the actions of their deputies. As stated by the Virginia Supreme Court in 1853:

> The acts and defaults of the deputy, *colore officii*, are considered in law as the acts and defaults of the sheriff, who is liable therefor in the same form of action as if they had been actually committed by

42

> himself.    He    cannot    be    imprisoned    or
> indicted, but may be fined for the conduct
> of his deputy.

Mosby v. Mosby, 50 Va. 584, 603 (1853).    See also Moore v. Dawney, 13 Va. 127, 132 (1808) ("The law looks upon the Sheriff and his officers as one person . . . ."); James v. M'Cubbin, 6 Va. 273 (1800) ("It is a rule that the sheriff shall answer civilly for all the acts of his deputy.").    Support for this proposition can even be found as recently as twenty years ago. Agyeman v. Winston, 26 Va. Cir. 140, 143 (1991) ("The above cases [Mosby, Moore, and M'Cubbin], while far from recent, have never been overruled or questioned by our Supreme Court.    I can only conclude that they still state the law.").

The Court recently recognized that § 1983 does not allow for vicarious supervisor liability for sheriffs or other state actors.    Francis v. Woody, 2009 U.S. Dist. LEXIS 43599, at *15 (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986)).    The opinion did not, however, address Francis's antiquated, but still viable, theory of common law sheriff liability - a theory that, because it does not implicate § 1983 and does not seek damages against the state, is not precluded by the prior opinion.

However, the claim based on that theory is precluded by the record. In order for Woody to be vicariously liable for the wrongs of his deputies, at least one of his deputies must have committed at least one wrong for which he or she is personally liable. The record does not reveal any such liability on behalf of Woody's deputies. The deputies' actions, as listed throughout the pleadings and the record, are not categorized and pled as constituting specific torts, but are rather pled in terms of constitutional violations. Although Francis's deposition testimony contains descriptions of several instances of callous conduct,[23] Francis has not produced any genuine issues of material fact as to any constitutional violations that would allow him to proceed to trial. Therefore, there is no act or omission for which Woody would be vicariously liable.

## CONCLUSION

Based on the foregoing, the Defendants' MOTION FOR SUMMARY JUDGMENT (Docket No. 59) will be granted as to all remaining counts (I, II, IV, and V), the Plaintiff's SECOND MOTION FOR

---

[23]     Francis asserts that Maj. Hill worked mental cruelty upon him by telling Francis while he was down and ailing, "Don't worry about it. I'm a mortician. I'll take care of you." Francis Depo. at 80:10-20. Also, Maj. Barrett allegedly failed to help Francis up while he was down, although Francis was then helped up by Maj. Hill. Id. at 80:23-81:15.

44

SANCTIONS (Docket No. 64) will be denied, and the case will be dismissed in its entirety.

It is so ORDERED.

_____ /s/   REP

Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date:   July _10_, 2011